Todd A. ERDMANN, Plaintiff-Appellant,

v.

SF BROADCASTING OF GREEN BAY, INC. and WLUK-TV
Channel 11, Defendants-Respondents.†

Court of Appeals

*No. 98–2660. Submitted on briefs May 24, 1999.—Decided
June 29, 1999.*

(Also reported in 599 N.W.2d 1.)

†Petition to review denied.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Brian C. Hough* of *Robinson Law Firm*, Appleton.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Gregory B. Conway, Sarah E. Ramaker* and *April Rockstead Barker* of *Liebmann, Conway, Olejniczak & Jerry, S.C.*, Green Bay.

A non-party brief was filed by *James A. Friedman* and *Kendall W. Harrison* of *La Follette Sinykin, LLP*, Madison, for The Wisconsin Broadcasters Association.

Before Cane, C.J., Myse, P.J., and Hoover, J.

MYSE, P.J. Todd Erdmann appeals a summary judgment dismissing his defamation complaint. The trial court granted SF Broadcasting of Green Bay, Inc., and WLUK-TV Channel 11's (collectively, Channel 11) summary judgment motion on the grounds that: (1) an alleged television report defamation was substantially true and therefore protected by the fair report privilege; and (2) alternatively, that Erdmann was a limited purpose public figure and had failed to establish the required showing of malice to support his defamation claim. Erdmann contends that the trial court erred because the facts underlying the television report were not true. He further contends that because he was not a limited purpose public figure, he was not required to establish malice. Erdmann also argues that even if he was a public figure, he proved actual malice. Because we conclude that Erdmann was a limited purpose public figure and that the record contains no evidence establishing actual malice, we affirm the court's summary judgment dismissing the complaint. Accordingly, we need not address the trial court's alternative ground for granting summary judgment. *See Sweet v.*

159

*Berge*, 113 Wis. 2d 61, 67, 334 N.W.2d 559, 562 (Ct. App. 1983) (only dispositive issues need be addressed).

## BACKGROUND

A sixteen-year-old boy dialed 911 claiming that a masked man had shot him in the stomach. The boy reported to the Outagamie County Sheriff's Department that the masked man appeared at the boy's home, asked for the boy's sister, and then shot him after being informed that the sister was not home. The boy's father told police that he was certain the shooter was Todd Erdmann, who reportedly had been "stalking" the sister.

Investigators learned that the Oshkosh Police Department had previously investigated and contacted Erdmann regarding complaints that he was stalking the sister. Although the sister did not know Erdmann well, he sent her several notes and letters, one of which was signed in blood. The police learned that Erdmann was a "survivalist," had access to several weapons, and that the Oshkosh police had warned Erdmann about stalking the sister. When the police learned of the boy's shooting, they placed his sister in protective custody, sent a SWAT team to the EAA facilities where the sister worked, and evacuated the facilities out of concern that Erdmann was on his way there. Meanwhile, the Outagamie County sheriff sent "an attempt to locate" to neighboring law enforcement jurisdictions requesting that they assist in the search for Erdmann and warned that Erdmann could be armed and dangerous.

That afternoon, the sheriff held a news conference at which he described the incident as it was reported to his department. He advised reporters that they were searching for Erdmann, that they believed him to be

armed and dangerous, and that they believed he had access to large caliber and semi-automatic weapons.

Erdmann was subsequently arrested just after 5 p.m. that day at a bowling alley in Marion, Wisconsin, and held overnight in the Outagamie County Jail. WLUK-TV Channel 11 reported the following on its 9 p.m. newscast:

WLUK REPORTER: A 29-year-old Shawano County man is in jail following a shooting at a Greenville home. It all started about 1:30 this afternoon, just west of Appleton on School Street where the suspect apparently shot a teenager in the stomach. The gunman was on the loose for much of the afternoon, later, caught by police in Marion in Northern Waupaca County. Fox 11's Rick Blum tells us the shooting has left a 16-year-old in the hospital and a neighborhood scared. Relatives of the victim couldn't believe what happened. Twenty-nine-year-old Todd Erdmann apparently came to this duplex in Greenville looking for a woman. When he couldn't find her, police say he took his vengeance on her little brother.

BRAD GEHRING, OUTAGAMIE CO. SHERIFF'S DEPT.: A masked individual wearing a dark jacket and gloves entered his home, apparently asked about the location of this individual's sister, and then fired at him, leaving the residence.

WLUK REPORTER: A massive manhunt ensued. Workers closed the EAA Museum in Oshkosh where the sister of the victim worked while police searched for Erdmann. The search ended in Marion at 5:15 with Erdmann's arrest. Police were worried what Erdmann could have gotten into if he had remained on the loose.

161

BRAD GEHRING, OUTAGAMIE CO. SHERIFF'S DEPT.: We feel he has access to other weapons; larger caliber weapons, semi-automatics . . . .

WLUK REPORTER: The 16-year-old remains at Appleton Medical Center after undergoing surgery for a bullet wound to the stomach. Neighbors also had to recover from the shocking incident earlier today.

LINDA STEFFEN, NEIGHBOR: It's terrifying. You don't expect this, not here, not in this community.

LUANN HUFFCUTT, NEIGHBOR: Sometimes you feel like you have a false sense of security living in a small town, but those kinds of acts of violence, whether they're random or not, they touch us all.

WLUK REPORTER: Erdmann should appear in Outagamie County court tomorrow for the actions he committed here today. Relatives are glad he's off the street, now they just want to know why he did what he did.

The day following Erdmann's arrest, the boy confessed that he had shot himself and had made up the story about the masked man. The police released Erdmann from custody shortly thereafter. The boy's confession that the gunshot wound was self-inflicted and Erdmann's reaction to the false allegation were broadcast several times in subsequent newscasts during the three days following Erdmann's release.

Erdmann subsequently brought this defamation action, and Channel 11 filed a motion for summary judgment. The trial court granted summary judgment, basing its order dismissing Erdmann's claim upon alternative theories. First, the trial court concluded that Channel 11's report was substantially true because it accurately reflected the statements police

made, even though the actual facts were other than those the police publicly identified. Alternatively, the trial court concluded that Erdmann was a limited purpose public figure, and that he had failed to make the required showing of malice to support his defamation claim. Because there was no factual basis upon which Erdmann could succeed in his claim, the trial court granted summary judgment. This appeal ensued.

## ANALYSIS

We review the trial court's grant of summary judgment de novo. *See Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315–16, 401 N.W.2d 816, 820 (1987). We use the same methodology as the trial court. *Id.* That methodology is well established, and we need not repeat is here, except to note that summary judgment must be granted if the evidentiary material demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Section 802.08(2), STATS.

To make a prima facie case for summary judgment, Channel 11, as moving defendant, must establish a defense that would defeat Erdmann's claim as a matter of law. *See Voss v. City of Middleton*, 162 Wis. 2d 737, 748, 470 N.W.2d 625, 629 (1991). In defense of Erdmann's defamation claim, Channel 11 contends that Erdmann is a "limited purpose public figure" who failed to establish proof of malice on summary judgment.

The elements of a common law defamation claim are:

(a) a false and defamatory statement concerning another;

(b) an unprivileged publication to a third party;

(c) fault amounting at least to negligence on the part of the publisher; and

(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Van Straten v. Milwaukee Journal Newspaper Publisher*, 151 Wis. 2d 905, 912, 447 N.W.2d 105, 108 (Ct. App. 1989).

The United States Supreme Court added a constitutional element to defamation claims that is dependent on the plaintiff's status. The Court held that the First and Fourteenth Amendments to the United States Constitution require that for public officials to recover damages in a defamation action against a media defendant, they must prove by clear and convincing evidence that the defamer acted with "actual malice." *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279–83 (1964). The definition of "public official" has since expanded to include a "public figure" who, by being drawn into or injecting himself or herself into a public controversy, becomes a public figure for a "limited purpose" because of his or her involvement in a "particular public controversy." *Wiegel v. Capital Times Co.*, 145 Wis. 2d 71, 82, 426 N.W.2d 43, 48–49 (Ct. App. 1988). The Wisconsin Supreme Court has stated that a limited purpose public figure must establish that the news media acted with actual malice. *Lewis v. Coursolle Broadcasting*, 127 Wis. 2d 105, 119, 377 N.W.2d 166, 172 (1985).

Because a plaintiff's status controls whether he or she must prove actual malice, the question whether a person is a limited purpose public figure should be resolved first and is a question of law. *Id*. at 109–110, 377 N.W.2d at 168. If the plaintiff is determined to be a limited purpose public figure, the court must then determine whether the evidence in the summary judgment record could support a reasonable jury finding that plaintiff has shown actual malice. *See Bay View Packing Co., v. Taff,* 198 Wis. 2d 653, 677, 543 N.W.2d 522, 530 (Ct. App. 1995).

In *Wiegel,* we identified the following analysis to determine whether a defamation plaintiff is a limited purpose public figure: (1) there must be a public controversy; (2) isolating the controversy at issue to determine its scope; (3) examining the plaintiff's role in the controversy to be sure it is more than tangential; and (4) determining if the alleged defamation was germane to the plaintiff's participation in the controversy. *See id*. at 82–83, 426 N.W.2d at 49; *see also Bay View Packing Co.,* 198 Wis. 2d at 678, n.6, 543 N.W.2d at 531, n.6.

Applying these criteria, we conclude that each has been demonstrated and that the trial court properly concluded that Erdmann was a limited purpose public figure. First, a "public controversy" is defined in terms of whether the dispute or controversy had "an impact outside of those immediately interested" in the dispute. *Denny v. Mertz,* 106 Wis. 2d at 650, 636, 318 N.W.2d 141, 148 (1982). Here, we note that this case involved a controversy affecting a wide range of citizens throughout northeast Wisconsin. A SWAT team evacuated a

prominent public building in an effort to safeguard employees from what the SWAT team perceived as a danger or violence from Erdmann. The Outagamie County sheriff disseminated a request for help in apprehending Erdmann to neighboring jurisdictions and advised law enforcement throughout the area that Erdmann was armed and dangerous. Most importantly, the sheriff publicly identified Erdmann as an armed and dangerous individual in an attempt to alert citizens in northeastern Wisconsin of a perceived threat to their safety. There can be little doubt that the extent of the public awareness, the extraordinary steps law enforcement agencies took both in Oshkosh and in Outagamie County and alerting the general public to a perceived threat of danger from Erdmann are sufficient to meet the public controversy requirement. *See id.* at 649–50, 318 N.W.2d at 147.

Erdmann suggests that there is no public controversy when the issue is solely an allegation and investigation of criminal conduct. We do not agree that every allegation and investigation of criminal conduct is precluded from being considered a public controversy for the purpose of determining whether the individual alleged to have committed a crime is a limited purpose public figure. Criminal activity can generate a controversy which is at the height of public consciousness and which causes significant public reaction.[1] Even if

---

[1] A "public person" has been recognized as an "involuntary public figure" who is "involved in or directly affected by the actions of public officials." *See Wiegel v. Capital Times Co.,* 145 Wis. 2d 71, 84, 426 N.W.2d 43, 49 (Ct. App. 1988) (citing Tribe, American Constitutional Law 880 (2d ed. 1988)). Describing this category of "public person," Tribe offers the example of a magazine seller who is arrested by police for distributing obscene literature as "an involuntary public figure with respect

Erdmann's contention were true, in this particular case, his possession of automatic weapons, his "survivalist" inclinations, his stalking history, and his unknown whereabouts were all more than mere allegations of criminal conduct and raised an issue of public concern.

Next, we must determine the scope of the public controversy because it defines the scope of the public personality. *Wiegel*, 145 Wis. 2d at 83, 426 N.W.2d at 49. In this case, the controversy concerned the police investigation of an apparent attempted homicide, the perpetrator's apprehension, his subsequent arrest and the media's report of the event. The entire claim centers around Erdmann's alleged assault of the sixteen-year-old boy and represents the totality of the controversy in question. The investigation, apprehension, arrest and media reporting, all of which focused on Erdmann, encompass the entire controversy.

Third, we examine whether Erdmann's role in the controversy was trivial or tangential. *See id.* at 87, 426 N.W.2d at 50–51. Erdmann was the focal point of law enforcement's investigation and was identified in the information police disseminated about the perceived threat posed to citizens' safety in that part of the state. Because he was the object both of police conduct and of information that was publicly disseminated regarding his perceived dangerousness, his role in the public controversy was direct and substantial.

Finally, we address whether the alleged defamation is germane to Erdmann's role in the controversy. *See id.* at 87, 426 N.W.2d at 51. In this case, Erdmann

to reports or comments about the arrest." *Id.*; *see also Harris v. Quadracci*, 856 F. Supp. 513, 517 (E.D. Wis. 1994), *aff'd* 48 F.2d 247 (7th Cir. 1995) (a defendant in a criminal case would be a public figure as to news items concerning his case).

was the central figure in the controversy. He was at the heart of the controversy before Channel 11's news broadcast, as most of the law enforcement activity focused on investigating Erdmann's past activities and on trying to locate him. The subsequent media report of Erdmann's potential dangerousness as an armed fugitive whose whereabouts was unknown and the allegation of his violent assault on a sixteen-year-old boy are directly linked to the public controversy over the apparent attempted homicide and the efforts made toward the assailant's apprehension. The reports were ultimately demonstrated to be false. Nevertheless, the police department's efforts to apprehend Erdmann and to warn citizens of northeastern Wisconsin of his potential dangerousness, and the evacuation of a major tourist center in that part of the State all flow directly from the police department's identification of Erdmann as the boy's assailant.

The thrust of Erdmann's contention that he is not a limited purpose public figure seems to flow from his contention that he did nothing to place himself in the public controversy and, accordingly, cannot be deemed to be a limited purpose public figure. Unfortunately, Erdmann was thrust into this public controversy primarily because of the sixteen-year-old boy's false report of being shot by a masked gunman. From this, and other information gained from the purported victim's family, the police concluded that Erdmann was the assailant, that he was violent, that he had access to automatic weapons and that he was dangerous. Although police formulated these conclusions without any conduct or action by Erdmann, it is clear that "it may be possible for someone to become a public figure through no purposeful action of his own." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974).

Moreover, we note that while the initial identification and report about Erdmann flowed solely from the false police report and miscalculations about the reported incident, Erdmann personally appeared on television in regard to this controversy, responded to inquires and publicly explained his response to the false allegations. Therefore, although he initially did nothing to create a public figure status, Erdmann's subsequent conduct of publicly responding and explaining the incident did contribute to the public awareness of his identification and the facts surrounding the false police report. *See Wiegel,* 145 Wis. 2d at 88, 426 N.W.2d at 51 (a plaintiff's access to the media for purposes of rebutting the alleged defamation is relevant to his or her status as a public figure). While we have sympathy with those individuals who are thrust into the public lime-light without any affirmative conduct of their own, we can find no support for Erdmann's claim that limited figure public status cannot be created without purposeful or voluntary conduct by the individual involved.

Having concluded that Erdmann was a limited purpose public figure, we next examine the record to determine whether Erdmann has demonstrated actual malice by clear and convincing evidence. *See Bay View Packing Co.,* 198 Wis. 2d at 685, 543 N.W.2d at 534. Channel 11 contends that Erdmann has presented no evidence supporting his claim of malice. Actual malice is defined as "knowledge that it [the statement] was false or with reckless disregard of whether it was false or not." *Denny,* 106 Wis. 2d at 643, 318 N.W.2d at 144. To survive summary judgment, a plaintiff must show that the defendant in fact entertained serious doubts

as to the publication's truth. *Van Straten*, 151 Wis. 2d at 917, 447 N.W.2d at 110.

While it does not appear that Erdmann attempted to demonstrate actual malice in any of his summary judgment submissions, he does argue that the nature of the language used in the report was sufficient to demonstrate actual malice. Erdmann maintains that the absence of the word "alleged" in the report and the report's references to the word "gunman" and to an appearance in court for "actions he committed here today" are sufficient to create a disputed issue of material fact. We do not agree. While the facts the police provided to the media ultimately proved to be untrue, the television report accurately reflected the information law enforcement publicly disseminated. Law enforcement designated Erdmann as the gunman having access to automatic weapons and who was armed and dangerous to citizens in the area. Law enforcement reported that Erdmann committed the assault on the sixteen-year-old boy. Erdmann does not demonstrate that any portion of Channel 11's report was not a fair statement of the information the police publicly disseminated and he provides no evidence that Channel 11 actually entertained serious doubt as to the broadcast's truth. *See id.* at 918, 447 N.W.2d at 111.

It is well settled that the failure to use the word "allegedly" is insufficient to create a jury issue of actual malice. *Time, Inc. v. Pape*, 401 U.S. 279, 290 (1971). Furthermore, mere proof of failure to investigate the accuracy of a statement, without more, cannot establish the reckless disregard for the truth necessary for proving actual malice. *Gertz*, 418 U.S. at 332. Accordingly, we have concluded that actual malice is not established when reporters rely on police information

without evidence that the reporters actually entertained serious doubt about the truth of the reports they received from other sources. *Van Straten*, 151 Wis. 2d at 918, 447 N.W.2d at 111. Erdmann has offered no such evidence. There is no evidence from which a jury could conclude that Channel 11's broadcast was done with actual malice. Therefore, the trial court correctly determined that there was no disputed issue of material fact as to whether Channel 11 knew the police statements regarding Erdmann were false or were made in reckless disregard as to their truthfulness.

We conclude that the trial court properly granted Channel 11's motion for summary judgment dismissing Erdmann's complaint based upon Erdmann's status as a limited purpose public figure and his failure to provide evidence from which a reasonable jury could conclude that Channel 11's broadcast was issued with actual malice. Accordingly, we affirm the judgment and need not address the trial court's alternative ground for granting summary judgment. *See Sweet*, 113 Wis. 2d at 67, 334 N.W.2d at 562 (only dispositive issues need be addressed).

*By the Court.*—Judgment affirmed.